## The People v. James B. Lauder.

[See 79 Mich. 602.]

*Criminal law—Plea in abatement—Grand jury—Indictment.*

1. After a grand jury, composed of twenty members, had been organized, three additional names were ordered to be drawn for the purpose of securing the summoning, if possible, of a juror whose name remained in the box, and who was a stenographer. The desired name was drawn in good faith, and the juror appeared and was sworn after the jury had commenced their investigation, and thereafter acted as a member of the panel, and also as stenographer, receiving for such special services extra compensation under an arrangement made with the proper auditing board. The juror had acted as special

| | |
|---|---|
| 82 | 109 |
| 108 | 583 |

| | |
|---|---|
| 82 | 109 |
| f118 | 74 |

| | |
|---|---|
| 82 | 109 |
| 120 | 84 |
| 120 | 85 |
| 120 | 86 |
| 120 | 88 |

| | |
|---|---|
| 82 | 109 |
| f122 | 415 |
| f122 | 416 |

| | |
|---|---|
| 82 | 109. |
| e134 | ²410 |
| 82 | 109 |
| 135 | ²514 |

| | |
|---|---|
| 82 | 109. |
| j138 | ²328 |

prosecuting attorney in a contempt proceeding before then prosecuted against one of the persons against whom indictments were found by the grand jury. And it is held that the action taken was within the discretion of the court, and that it was not improper thus to secure the services of a stenographer, nor for the juror acting as such to receive extra compensation for his services; and that the fact of his having acted as such special prosecutor would not affect the validity of any of the indictments, except the one found against the respondent in the contempt proceedings.

2. A respondent who had been indicted for bribery interposed a plea in abatement, in which he averred that after several witnesses, naming them, had given their testimony, he appeared before the grand jury in obedience to a subpœna, and, being ignorant of the fact that charges of bribery against him were being inquired into, and without consulting counsel, or being advised in the premises, he was required and compelled to, and did, give his testimony, and was interrogated fully, as to said charges, and testified to facts material and necessary to prove their truth and to sustain said indictment, and that upon his testimony, and that of the *other* witnesses, the indictment was found; which plea is held . bad for uncertainty and insufficiency:

*a*—It is uncertain whether it is based upon the reception of incompetent testimony, or upon the point that the respondent's constitutional rights were violated in compelling him to give testimony against himself.

*b*—If based upon the first ground, it is insufficient in that it does not state that some one material fact, stating it, was *alone* testified to by respondent, without which testimony an indictment could not have been found; as in the absence of such averments it must be assumed that the jury acted solely upon the testimony of the other witnesses in finding the indictment, and that it was competent and sufficient for that purpose.

*c*—The fact that respondent was subpœnaed to attend before the grand jury, was sworn, and gave testimony relative to the charge of bribery, then being investigated, and that upon his and the other testimony a true bill was found against him, will not vitiate the indictment.

*d*—The constitutional rights of respondent were not violated by his being subpœnaed and appearing before the grand jury, and being sworn, nor in testifying upon any matter that did not criminate him, and, if he testified without objection, he will be deemed to have done so voluntarily.

*e*—Respondent does not aver in his plea that he claimed his privilege, or refused to answer any interrogatories, but that he was required and compelled to, and did, make answer to the

questions put to him. This is a conclusion from the facts, which he was required to set forth, and not such conclusion.

*f*—As respondent was not upon trial for any offense, no exception can be taken to his not having the assistance of counsel.

*Certiorari* to Wayne to review proceedings resulting in indictment of respondent by a grand jury. (Reilly, J.) Argued July 1, 1890. Pleas in abatement overruled August 1, 1890, and opinions filed October 7, 1890, *nunc pro tunc* as of date of such order. The facts are stated in the opinions.

*Fred H. Warren* and *F. A. Baker*, for petitioner.

*James V. D. Willcox, Allan H. Frazer,* and *Otto Kirchner,* for the people.

CHAMPLIN, C. J. This case comes here upon writ of *certiorari* issued by this Court to the circuit court for the county of Wayne.

Lauder was indicted by a grand jury of Wayne county. To this indictment he interposed two pleas in abatement. The first plea relates to the composition and legality of the grand jury which found the indictment. The second relates to what is claimed as a violation of the constitutional right of Lauder in being summoned before the grand jury, and being examined by them upon the subject-matter for which he was indicted. The first plea in abatement we hold to be bad, for reasons stated in the opinion of Mr. Justice MORSE, *post,* 126. The second plea in abatement we think should be overruled, for the reason that it is uncertain and insufficient. The following is the second plea:

"And the said James B. Lauder, in his own proper person, for his second plea in abatement to the said indictment, says that while the said indictment and the charges of bribery therein contained were pending before the said

grand jury, and they were inquiring into said charges, and considering the question whether they would find the said indictment to be a true bill, and present the same to the court, and after Peter Hirth, Charles G. Eggeman, Charles Flowers, Augustus G. Kronberg, and William Uthes, who are all the witnesses for the people whose names are indorsed upon said indictment, had been fully examined, and had given their testimony before the said grand jury, to wit, on the 18th day of September, 1889, a subpœna was issued out of said court, under the hand of Allan H. Frazer, an assistant prosecuting attorney for said county of Wayne, commanding the said defendant, James B. Lauder, to appear before the said grand jury as a witness, on, to wit, the 18th day of September, 1889, at 10 o'clock in the forenoon; that said subpœna was served by the sheriff of the county of Wayne upon the said defendant, James B. Lauder, to wit, on the 18th day of September, 1889, by exhibiting to him the original, and informing him of the contents thereof, and delivering to him a copy of said subpœna; that said defendant, James B. Lauder, being wholly ignorant of the fact that said indictment and charges of bribery against him were pending before and were being inquired into by said grand jury, without consulting counsel, or being advised in the premises, appeared before said grand jury in obedience to said subpœna on the said 18th day of September, 1889, and while under legal restraint before said grand jury he was required and compelled to take his oath as a witness before said grand jury, and under such oath he was required and compelled to give his testimony in the matter of the charges of bribery set forth in said indictment, and so pending against him before said grand jury as aforesaid; that he was interrogated fully as to said charges of bribery, and was questioned as to each and every detail and circumstance of the same, and to all of which interrogatories and questions he was then and there, without having the aid and advice of counsel, required and compelled to make, and did make, answer; that in so testifying, and because the said defendant did not have the assistance of counsel to bring out all the facts and circumstances of the case, and while under legal restraint as aforesaid, he, the said defendant, in response to the questions and interrogatories put to him, did testify to facts material and necessary to prove the truth of said charges of bribery, and to sustain and

establish the said indictment as a true bill; that upon the testimony of the said witnesses for the people, and the testimony of said defendant so given before the said grand jury as aforesaid, the said grand jury did find the said indictment to be a true bill, and did, to wit, on the 24th day of September, 1889, present the said indictment to said court; and this the said defendant is ready to verify, and he prays judgment of said indictment, and that the same may be quashed, etc.

"JAMES B. LAUDER,

"Defendant.

"FRED H. WARREN,
         "Attorney for Defendant.
"F. A. BAKER,
     "Of Counsel.

"STATE OF MICHIGAN, ⎰ ss.
   County of Wayne,    ⎱

"James B. Lauder, the above-named defendant, being duly sworn, upon his oath deposes and says that he has heard read the above and foregoing first and second pleas in abatement, by him subscribed, and knows the contents thereof, and that both of said pleas are true in substance and fact.

"JAMES B. LAUDER.

"Subscribed and sworn to before me this 13th day of January, A. D. 1890.

"A. G. KRONBERG,
     "Notary Public, Wayne County, Michigan."

By this plea in abatement two causes are assigned as reasons why the indictment should be abated:

1. Because of the reception by the grand jury of incompetent testimony.

2. Because respondent's constitutional privilege was invaded in compelling him to testify against himself.

In determining the sufficiency of this plea it should be borne in mind that the finding of the grand jury was not a trial upon the merits, but a presentment of charges or mere accusation upon which a trial may be had. The plea does not assail the form or the substance of the indictment, but sets up the misconduct of the grand jury

82 MICH.—8.

in proceedings before them, anterior to the finding of the indictment. It is a dilatory plea, which, in the unbroken practice of the courts, is for that reason looked upon with disfavor, and has always been subjected to technical rules. When such dilatory pleas are resorted to, we must apply to them those long-established canons of construction to test their sufficiency for the purpose of abating the prosecution, which the experience of courts through a long series of years has found necessary to protect suitors from unnecessary delay and expense. Those rules are necessarily strict and technical, and a party interposing such dilatory plea invites the most rigid scrutiny of its sufficiency under the established rules of pleading.

It is laid down in works on pleading, and supported by abundance of authority, that a plea in abatement must be certain to every intent; and the greatest accuracy and precision are required in framing it. 1 Chit. Pl. 445, 448; Gould, Pl. chap. 3, §§ 57, 58; 1 Bish. Crim. Proc. § 324; *Dolan v. People*, 64 N. Y. 492; *O'Connell v. Reg.*, 11 Clark & F. 155; *State v. Bryant*, 10 Yerg. 527; *State v. Newer*, 7 Blackf. 307; *State v. Brooks*, 9 Ala. 9; *Hardin v. State*, 22 Ind. 347; *Findley v. People*, 1 Mich. 234; *Belden v. Laing*, 8 Id. 500. The second plea in abatement is bad for uncertainty and insufficiency. It is uncertain whether it is based upon the reception of incompetent testimony, or upon the point that the prisoner's constitutional rights were violated in compelling him to give testimony against himself. If based upon the reception of incompetent testimony, then the plea is insufficient, in that it does not state that some one material fact, and what material fact, was testified to by himself, without which testimony an indictment could not have been found, which fact was not testified to or established by the testimony of the other witnesses examined. From all that is alleged in

such plea, it may still be true that the testimony of the other witnesses named was sufficient evidence of the facts charged to support the indictment, and to justify the jury in finding a true bill. In a plea in abatement nothing must be left to inference to support the plea. On the contrary, all intendments are to be taken against the pleader. Hence we must assume that the testimony of the other witnesses named in the plea and indorsed upon the information was the testimony upon which the grand jury acted in finding a true bill against the respondent, and that it was sufficient and competent testimony for that purpose.

The point whether the indictment was bad because the grand jury admitted incompetent evidence was before the court of appeals of the state of New York in *Hope v. People*, 83 N. Y. 418. Mr. Justice Rapallo said:

"The demurrer to the special plea interposed on behalf of the prisoner was properly sustained. The substance of the plea is that the grand jury by whom the indictment was found did not proceed in accordance with law, but considered, regarded, and examined improper, incompetent, and irrelevant matters; and the specification is that they had before them for their consideration, and as part of their method of inquiry, and did consider, certain *ex parte* affidavits taken before a police justice in an examination had before him as such, together with the examination of the prisoner taken in accordance with the statute. We find no authority for the position that the sufficiency of the evidence upon which an indictment is found by the grand jury is a question which can be raised by plea to the indictment, or that the reception of incompetent or irrelevant evidence by the grand jury can be pleaded. *People v. Hulbut*, 4 Denio, 136, is to the contrary, and no case has been cited in support of the plea. * * * Moreover, it does not state facts which would be sufficient, even on a motion, to require the court to quash the indictment. It does not aver or show that the *ex parte* affidavits were the only evidence before the grand jury, nor that the witnesses by whom they were made were not also personally examined, or that the indictment was

not based upon sufficient competent evidence; nor does it contain the very essential averment that any fact material to the case of the prosecution was established by such *ex parte* affidavits; nor does it show that the prisoner was in any manner prejudiced by their being before the grand jury."

The same question came before the supreme court of New Jersey in *State v. Dayton*, 23 N. J. Law, 49. Chief Justice Green, upon page 56, says:

"If the position be sound that every indictment not found upon the production of legal and competent evidence before the grand jury is essentially vicious, it follows that in all cases where the witnesses produced before the grand jury are from any cause legally disqualified or incompetent to testify, or where any essential link in the chain of testimony is sustained by evidence not in itself legal, the indictment cannot be sustained, although there be ample competent testimony not produced before the grand jury to sustain the charges of the indictment."

He also says:

"But conceding that the proposition is fully established, that there was not legal and competent evidence before the grand jury, does that afford the subject-matter to sustain either a motion to quash or a plea in abatement? We are clearly of opinion that in this state, at least, it does not.

In this last position the learned court is not sustained by the weight of authority. There must be legal and competent testimony before a grand jury to sustain an indictment. 1 Whart. Crim. Law (7th ed.), § 493.

In the case of *State v. Logan*, 1 Nev. 509, the trial court quashed the indictment on motion of counsel for defendant on the ground that it "was found upon illegal and incompetent evidence." In reversing this action of the circuit judge, the supreme court of Nevada say:

"The proposition that, if a grand jury receive and consider any but legal proofs, the indictment found by them may be quashed upon that fact being shown to the court, having no authority to support it, and being so mani-

festly repugnant to the utility of the entire grand jury system, scarcely justifies an extended consideration. * * * As none but legal evidence can be introduced upon the trial of the defendant, it would clearly be improper to find an indictment where there is not sufficient *legal* evidence to justify a conviction; hence the rule that the grand jury should receive none but legal evidence. But the reason of the rule will not authorize the setting aside the indictment merely because evidence not of the best legal character is received and considered. If there be nothing to support the bill but evidence clearly incompetent, and which would not be admissible at the trial, as the sole testimony of a person rendered incompetent by the conviction of an infamous crime, the indictment may be quashed before plea; but where there is the slightest legal evidence, the court cannot inquire into its sufficiency, or set it aside, because some illegal evidence was received with it." *U. S. v. Reed,* 2 Blatchf. 466; *People v. Hulbut,* 4 Denio, 133; *Washington v. State,* 63 Ala. 189; *Bloomer v. State,* 3 Sneed, 69; Thomp. & M. Jur. § 642.

Lauder was not a competent witness before the grand jury in a matter pending against himself. It appears affirmatively from the plea that there were other witnesses produced and sworn, and their names are indorsed upon the indictment. It was necessary, therefore, in order to present the question that the indictment was found upon incompetent evidence, or upon the evidence of a witness who could not be sworn upon the trial and be compelled to testify, for the plea to state positively that there was no legal evidence given before the grand jury upon some material fact, stating it, and that his testimony, stating it, was the only testimony which tended to establish such material fact. Without such averment the plea is insufficient and uncertain, for, notwithstanding all that is stated and averred in the plea, there may have been, and the court must presume there was, testimony other than that of Lauder's, legal in character,

and sufficient to justify the jury in finding the indict-ment.

The second ground for quashing the indictment, namely, that the grand jury violated Lauder's constitutional right in compelling him to attend before them and testify against himself, presents a question of gravest import-ance, and is the only one upon which I have entertained any doubt. It has been presented to this Court with great force and ability; but, upon mature consideration, I am obliged to hold that the plea does not make a case for quashing the indictment. The question presented is, does the fact that Lauder was subpœnaed to attend before the grand jury, was sworn, and gave testimony relative to the charge of bribery, which the grand jury was then investigating, and upon his and the other testimony the jury found a true bill, vitiate the indictment? I have already shown that the plea does not aver that there was not sufficient legal and competent testimony without his to support the finding of the indictment, and that all intendments are taken against the plea, and that we must presume that there was sufficient legal and competent testimony without his to warrant the jury in finding a true bill against Lauder. If, therefore, the indictment is to be held bad, it must be so held as a rebuke to the grand jury, and punishment to the people, for having violated the constitutional right of Lauder. To this com-plexion must it come at last, for the circuit court has before it a valid indictment, found upon sufficient legal and competent testimony. The testimony of Lauder before the grand jury cannot be used against him upon the trial. *Rex v. Lewis,* 6 Car. & P. 161; *Rex v. Davis,* Id. 177; *Reg. v. Owen,* 9 Id. 238; *Reg. v. Wheeley,* 8 Id. 250; *People v. McMahon,* 15 N. Y. 384; *People v. Mondon,* 103 Id. 211. Nor upon the trial can he be compelled to

testify against himself. The case stands before the court in all respects as if Lauder had not testified before the grand jury. Why should the indictment be quashed? Is it simply that another grand jury may be summoned, impaneled, and the legal and competent testimony be again presented, and another indictment found in all respects like the one before the court? When all this has been done, the court has traveled in a circle, and come again to the point now occupied, and what has been gained for the cause of justice? What has been gained or secured for the privilege of the citizen? Absolutely nothing. But, instead, delay in the administration of the law, and great and needless expense to the people. It would be different if the violation of this constitutional right had operated to Lauder's injury, as it might had he been the only witness, or his the only testimony upon some material point upon which the indictment was found. But this is not the case made by the plea. He shows no injury; simply a violated privilege.

This brings me to a consideration of the claim of a violation of a constitutional right or privilege. And, first, it may be premised that being subpoenaed and appearing before the grand jury was not a violation of his constitutional right, nor being sworn before that body, nor testifying upon any matter that did not criminate himself. All these the law compelled him to do under pains and penalties. But the law did not compel him to give testimony that would criminate himself. The fundamental law expressly declared that he should not be compelled to do so. It was therefore a personal privilege, and Mr. Lauder could claim it or not as he chose. If he gave such criminating testimony voluntarily, it is doubtful if it could be used against him upon the trial. If it was not voluntarily given, it could not be used against him upon the trial. In all cases where a personal privilege exists

for a witness to testify or not, if such witness does testify without objection he will be deemed to have done so voluntarily. How could there be compulsion or legal restraint, when there was no law which could compel Lauder to testify to criminating matters against himself, or punish him for refusing to testify? He does not claim in his plea that he claimed his privilege, or refused to answer any interrogatory. He ᵥavers that he was required and compelled to, and did, make answer to the questions put to him. This is a conclusion from the facts. The rules of pleading in abatement required him to set forth the facts, and not his conclusions. The same is true with the averment of the plea with reference to his being compelled to take his oath. But, as before observed, there was no violation of Lauder's constitutional rights in compelling him by subpœna to attend before the grand jury, nor in administering an oath to him. The real complaint made by the plea is that Lauder was subpœnaed to appear before the grand jury, and he appeared in obedience thereto; that he was sworn, was interrogated, and answered all questions. He states that all this was done without having the aid and advice of counsel, and "because he did not have the assistance of counsel to bring out all the facts and circumstances of the case" he testified to facts material and necessary to prove the truth of the charges. As he was not upon trial for any offense, no exception can be taken to his not having the assistance of counsel; and, as he made no objection to testifying on account of privilege, I do not see why that should be appealed to as a ground for quashing the indictment.

In *People v. King*, 28 Cal. 265, the respondent was sub⁻ pœnaed before the grand jury, and gave testimony against himself. This was made the ground of a motion to quash the indictment. In deciding this point, the court said:

"So far as the motion was based upon the ground that

the defendant had testified against himse?? before the grand jury is concerned, it is only necessary to say that we know of no rule of law which made it illegal for him to testify if he felt inclined to do so, nor do we know of any rule of law which makes the voluntary testimony of the defendant before the grand jury a ground for setting aside the indictment."

In *U. S. v. Brown*, 1 Sawy. 531, the defendants were subpœnaed before the grand jury, and their testimony taken respecting the offense for which they were afterwards indicted. Other witnesses were also examined. Each defendant moved to set aside and quash the indictment, because they were compelled to appear before the grand jury and testify against their will. The court denied the motion. In both of these cases there was other competent testimony upon which the jury might have acted. See, also, Thomp. & M. Jur. § 643.

A party may waive personal rights, although secured to him by law or by the Constitution. He may waive the right to a preliminary examination upon a criminal charge. *Washburn v. People*, 10 Mich. 372; *Hicks v. People*, Id. 395; *People v. Jones*, 24 Id. 215; *Pierson v. People*, 79 N. Y. 429; *Lee v. Tillotson*, 24 Wend: 337; *Van Hook v. Whitlock*, 26 Id. 43; *People v. Murray*, 5 Hill, 468; *Baker v. Braman*, 6 Id. 47; *Embury v. Conner*, 3 N. Y. 511; *People v. Rathbun*, 21 Wend. 509, 542. In *People v. Arnold*, 40 Mich. 713, this Court said:

" No doubt the witness might have declined to answer, under the acknowledged rule that no one can be compelled to criminate himself. But this is a matter of personal privilege which a witness may waive, and is not a ground of objection by the people; and here the witness did not object, and we cannot assume but that he was not only willing but desirous to answer."

We do not find it necessary to determine whether the grounds set up and relied on to quash the writ can properly be raised by plea in abatement, or whether they

should not be raised by motion to quash. If issues of fact had been joined upon the pleas, we suggest that very serious obstacles lie in the way of trying such issues. Grand jurors cannot, in general, be questioned as to what took place among or before them while acting as such. The only exceptions existing are made by How. Stat. § 9502. That section permits members of the grand jury to testify *upon the trial* in two instances: One, where a witness upon the trial has testified before them, they may testify whether the testimony of the witness examined before them is consistent with or different from the evidence given by such witness before the court; and in the other they may be required to disclose the testimony given before them by any person upon complaint against such person for perjury, or upon· his trial for such offense.

"Where the statute prescribes the cases in which a grand juror may testify, it is held that he may do so in no other." 9 Amer. & Eng. Enc. Law, p.´ 17, and cases cited to note 1, p. 18.

But neither of these contingencies has arisen in this case. Lauder has not been offered as a witness upon his trial, and cannot be unless he voluntarily presents himself as such, and then he would waive his privilege, and would stand upon the same footing as any other witness. Neither has a complaint been made against him for perjury; so upon the trial of this plea no juryman could be permitted to testify against or for him. Such testimony is not permitted on grounds of public policy. The same immunity extends to the clerk of the grand jury, and the prosecuting officer if present at their deliberations. Best, Ev. § 579; 1 Tayl. Ev. § 863; 1 Greenl. Ev. § 252. The statute further declares that in no case can a member of the grand jury be obliged or allowed to testify or declare in what manner he or any other member· voted

on any. question before them, or what opinions were expressed by any juror in relation to any such question. The same principle of public policy would not permit a witness who was present in the grand-jury room to testify in any case where a grand juror could not testify. How, then, could it be proved that Lauder gave testimony material to the case upon which the jury found the indictment, or how could it be proved that the grand jury found the indictment upon *his* and the testimony of the other witnesses? The latter fact is quite beyond the knowledge even of Lauder, if he could be deemed a competent witness, which I do not think he would be.

The statute makes it a felony for any person to bribe or attempt to bribe any executive, legislative, or judicial officer. It is alleged in the indictment that Peter Hirth bribed Lauder, who was an alderman of the city of Detroit, to vote for him for the office of meat inspector. It was competent and proper for the grand jury to indict Hirth for the offense of bribery; and, had they investigated with that view, it would have been competent and proper for them to have subpœnaed Lauder, and to have interrogated him with reference to the transaction; and had he not claimed his privilege, and had testified fully, and no indictment had been found against Lauder, we hardly think that he would have complained that his constitutional rights had been violated by the grand jury. Yet they would have been violated in that case as much as they were in this. The *gravamen* of his complaint cannot justly be said to lie in the fact that he was summoned before the grand jury, was sworn and testified, but it exists, if at all, in the fact that he was afterwards indicted by the grand jury. Being indicted by a grand jury is not a violation of a constitutional right. I can conceive a case where it would be an outrage upon a citizen, similar to that perpetrated under the general warrant

of James Otis' time; and such would be the case if a grand jury, for the purpose of obtaining information against a person upon which to found an indictment against him, should summon him before them, and compel him, against his objection, to testify to criminating facts, or worm out of him testimony detrimental to his rights, and upon such testimony only should indict him. But I cannot conceive of a case when, if such person stood upon his rights, such thing could be successfully accomplished, for such testimony cannot be compelled from an unwilling witness. It is true that the timid, the feeble minded, or the ignorant might not stand upon their rights, and might be imposed upon, having no counsel at hand to protect them. In all cases, in the progress of events, their case must come before a trial court, and they would have the aid of counsel who would bring the facts to the attention of the judge with all necessary and proper averments, where their rights could be fully protected. In this case, Mr. Lauder has the advice and assistance of eminent counsel, who have placed his case in their plea in as favorable a light as possible for him, and we find that he makes no averment that he was summoned by the grand jury to give testimony for the purpose of obtaining information from him upon which to find an indictment against him, nor that they would not have found an indictment without his testimony, nor that he was a timid person, and was overawed by the grand jury, nor that he was feeble minded, or ignorant of his rights, and the jury took advantage of his mental condition or want of knowledge to his injury.

To restate the case, Lauder was lawfully summoned and sworn. He testified without claiming his privilege. How were his constitutional rights any more violated than in the ordinary case of a party who is a witness upon the trial of a cause who is asked questions which,

if answered, would criminate him, and he answers without objection or claiming his privilege? The compulsion in that case is the same as in the one under consideration. Was ever a verdict or judgment set aside in such case upon the ground that the witness' constitutional rights had been violated in compelling him to testify to facts criminating himself? To state a more analogous case, suppose a person is upon trial, charged with a criminal offense, and a witness summoned by the people is sworn, and testifies without objection to facts which criminate him in reference to the crime under investigation and trial. Here he attends under the compulsion of a subpœna, and is sworn and testifies under the same compulsion. He is afterwards indicted upon the testimony of other competent witnesses. Would a claim that his constitutional right had been in this manner violated, embodied in a plea, afford sufficient ground for quashing such indictment? Clearly not. The plea in Lauder's case places him in no better position before the court. No more compulsion, and no more violation of personal rights.

The cases cited by the counsel for the plaintiff in *certiorari* are numerous and convincing, to the effect that the testimony given before the grand jury by Mr. Lauder cannot be used against him upon the trial. Such are the cases of *Rex v. Lewis*, 6 Car. & P. 161; *Rex v. Davis*, Id. 177; *Reg. v. Owen*, 9 Id. 238; *Reg. v. Wheeley*, 8 Id. 250; *Reg. v. Haworth*, 4 Id. 254; *Boyd v. U. S.*, 116 U. S. 616; *People v. McMahon*, 15 N. Y. 384; *People v. McCoy*, 45 How. Pr. 216; *People v. Mondon*, 103 N. Y. 211. The cases of *People v. Singer*, 5 N. Y. Crim. R. 1, 18 Abb. N. C. 96, and *People v. Haines*, 1 N. Y. Supp. 55, support the contention of plaintiff in *certiorari* that compulsory attendance of the party indicted before the grand jury is sufficient ground for quashing the indict-

ment, but they are the decisions of *nisi prius* courts, and the questions depended, as presented by motion to quash, very much upon the discretion of the presiding judges. In one case, at least, the court seems to have made haste to overthrow the indictment. The courts of last resort have not passed upon the question in that state, as I am aware of. The case of *State v. Froiseth*, 16 Minn. 297, is squarely in favor of quashing the indictment. The point was not argued 'before the court, but error was conceded by the attorney general.

The pleas having been overruled by order of this Court on the 1st day of August last, with the statement that we would file our opinion later, it being the day of final adjournment of the term, these opinions will therefore be filed *nunc pro tunc* as of that date.

CAHILL and GRANT, JJ., concurred with CHAMPLIN, C. J.

MORSE, J. At the September term, 1889, of the circuit court for the county of Wayne, a grand jury was ordered, summoned, and impaneled. The result of their deliberations was the finding and returning of seven indictments, two of which were against the relator. The defendants have, in that court, interposed pleas in abatement to all of these indictments. Said pleas are similar in character and import. We are concerned here, however, only with the case of Lauder. It is considered probable that our ruling in the case before us may affect, if not control, all the other cases, and for that reason we felt disposed to hear and determine the questions presented on application for *mandamus* that a speedy trial might be afforded the defendants, if such trial was found necessary. We therefore issued our writ of *certiorari* upon such application to bring the record in the lower court before us. But we are not willing that this shall

be made a precedent in other cases for the use of the writs of *mandamus* or *certiorari* to decide matters arising upon motions to quash or the issue joined in pleas of abatement to the indictments or informations in criminal cases. Usually, such questions must come before us on writ of error or *certiorari* after trial and judgment. In view of the importance and the number of cases involved in this matter, and the great expense that would necessarily be incurred in the trial of them, we have thought it best for the public interest, and the good of all concerned, that we should make this an exceptional case, and for once relax the rule to which we have heretofore always adhered.

Three questions are raised by the pleadings in Lauder's case; and, without noticing any technicalities as to the form of the pleadings, I shall examine and dispose of them upon the merits. Two of the questions relate to the organization of the grand jury, and will first be considered. It appears that on September 11, 1889, 47 persons had been drawn and summoned as grand jurors. Of these all but 20 had either failed to appear, or had been excused. Thereupon, upon the same day, as appears by the court records, the court made the following order:

"Ordered, that the clerk forthwith draw, according to law, the names of three (3) persons to serve as grand jurors at the present term of court, and to be and appear in the court September 12, at 2 P. M."

Before this order was entered, the 20 persons who had appeared were sworn and charged by the court as a grand jury, and had retired to their room, chosen a foreman, and reported the same to the court. On September 12, 1889, Thomas R. Rayl, Charles Flowers, and Hervy C. Park, were drawn, under the order of the day before, to serve as grand jurors. A *venire* was issued, returnable September 13, 1889. On that day the sheriff made return

that he had served the same on Rayl, but not on Park and Flowers. Rayl was then excused.. In the journal of the court, under date of September 16, 1889, appears the following entry:

"Charles Flowers, drawn and summoned as a grand juror, answered to his name; and after being duly sworn retired to the grand-jury room."

It is alleged in the plea of abatement, and not success-fully controverted, that the grand jury had entered upon their investigations and taken testimony before Flowers became a member of that body. The grand jury were in session five days before Flowers was sworn, as shown by the records of the court. Two of the circuit judges return that the order to summon three additional jurors was asked for by the assistant prosecuting attorney, after the grand jury had elected their foreman, and that the foreman of such jury said to the court that he hoped the order would be made, and gave his reasons therefor. Judge Hosmer does not recollect about the matter, but believes the statement of the other two judges to be true. Judge Reilly was absent, and does not know the facts. The short-book of the court shows that this order was the last one entered on September 11, 1889.

The plea in abatement sets forth that Charles Flowers is an attorney at law, and also a stenographer,—a short-hand reporter; that on September 11, 1889, Allan H. Frazer, then an assistant prosecuting attorney for said county of Wayne, was desirous to obtain a stenographer for the said grand jury, and applied in open court for the appointment of such stenographer, and called the attention of the court to the fact that the name of the said Charles Flowers was among the names—to wit, 103 names,—remaining undrawn in the grand jury box; that thereupon the court made the order to draw and sum-mon three additional jurymen, and among the three names

so drawn appeared, at the second drawing, the name of Charles Flowers; that on September 16, 1889, it was agreed between the board of auditors of Wayne county and said Charles Flowers that said Flowers should serve as a grand juror, and also act as the stenographer for said jury, and receive as pay for the latter services, in addition to his regular pay as grand juror, the sum of $7.50 per day, and also compensation for such services in translating and writing out his stenographic notes taken before said grand jury; that thereupon the said Charles Flowers, although no member of the grand jury had been discharged, and no vacancy in said grand jury had occurred by reason of the sickness, death, or non-attendance of any of said 20 grand jurors, appeared before the said circuit court, and was sworn as a grand juror, and retired to the jury-room, and from thence participated as a member of such jury, and as a stenographer in the employ of said county; that the said Flowers was at that time, and during his participation in the deliberations of said grand jury, an assistant prosecuting attorney of said county of Wayne, having been appointed on February 4, 1889, to prosecute one William W. Langdon in the contempt proceedings against him in said circuit court (see *Langdon v. Circuit Judges,* 76 Mich, 358); that among the indictments found by said grand jury, said Flowers participating in said finding, was one against the said Langdon, for the identical crime or offense with which he was charged in said contempt proceedings.

The replication to the plea sets forth that the order under which Flowers became a grand juror was entered before the 20 jurors were sworn and charged by the court, but admits that said Flowers was not sworn, and did not retire to the jury-room, until September 16, 1889. The replication also says that no testimony was taken, or other

82 Mich.—9.

proceedings had, by or before said grand jury until Flowers became a member thereof; that said Flowers was not employed by the people as assistant prosecuting attorney, and did not act as such, except in the contempt proceedings against said Langdon; and that he did not act in any capacity with said grand jury except as a grand juror.

The rejoinder of the defendant, Lauder, to this replication, put at issue the fact whether or not the order for the summoning of three additional jurors was made before or after the 20 jurors were sworn and impaneled as a grand jury, and had organized and reported the election of a foreman to the court, and whether or not they had begun their investigation and taken testimony before Flowers joined them, and his employment and action as a stenographer, and as a public prosecutor, while a member of said jury. To this rejoinder the people demurred.

As the record appears before us, it must be conceded that the three additional names were ordered to be drawn after the 20 men had been sworn and charged and organized as a grand jury; and that the object of drawing these names was to obtain, if possible, the summoning of Charles Flowers as a juror, that he might also act as a stenographer. That he did so act, under the promise of extra pay by the board of county auditors, must be also conceded. It is a little singular, when this was the avowed object of the drawing, that the second name to come out of the box was that of Flowers, the only man wanted out of 103 names remaining therein. But there is no evidence and no claim of any bad faith or trickery in the drawing. Of course, if any had been shown, it would have been the end of this case.

We are not prepared to say that the .object of this drawing was an illegal one, or that the employment of

Flowers as a stenographer was not proper. A stenographer was certainly desirable, and there can be no possible harm in one of the jurors, who has been regularly drawn and summoned, acting as such stenographer. Indeed, no other person could be tolerated or allowed to act as stenographer. The fact that Flowers received extra pay for his services does not affect the indictments. If he acted as such stenographer, there was no impropriety in his being paid for such services, as he could not be compelled to do this extra duty without compensation. Neither does the fact that he had been employed to act as public prosecutor against Langdon in the contempt case cut any figure as against the relator, James B. Lauder. The indictment against Langdon, if the plea in this case be true, is worthless, because it would be a crime against the liberty of the citizen to permit the presecuting attorney of a county to form one of the grand-jury panel; and it would be much worse to permit Flowers, who had been specially appointed to prosecute Langdon, and had prosecuted him, in the contempt proceedings, to sit upon the grand-jury panel, and participate in bringing in an indictment against Langdon for a criminal offense growing out of the identical transaction for which he had prosecuted him in the contempt case. But this does not touch Mr. Lauder. Flowers was prosecuting attorney in no case but that of Langdon. He was specially appointed for a special case, and, outside of that case, he was no more a public prosecutor than if he had never been appointed to prosecute Langdon. Therefore the question is, and the only question, as far as the organization of the jury is concerned, was it lawful after twenty men had been summoned, sworn, charged, and organized as a grand jury, and commenced their deliberations, to increase the number from twenty to twenty-one by the addition of Charles Flowers?

Our statutes provide that—

"There shall not be less than 16 persons sworn on any grand jury; and after such jurors have been impaneled, and have received their charge from the court, they shall retire with the officer appointed to attend them, and before they proceed to discharge the duties of their office they shall elect by ballot one of their number to be foreman, and give notice thereof to the court, and the clerk shall record the same." How. Stat. § 9494.

Twenty-three grand jurors are to be drawn and summoned. How. Stat. § 7562. So that in this State a grand jury may be lawfully impaneled and act, consisting of any number of persons more than 15 and less than 24.

"No indictment can be found without the concurrence of at least twelve grand jurors, and when so found, and not otherwise, the foreman of the grand jury shall certify thereon, under his hand, that the same is a true bill." How. Stat. § 9506.

The twenty-third section of the Wayne county jury act (Act No. 95, Laws of 1887) provides:

"And when a grand jury shall be ordered to be drawn, the clerk shall give the same notices, and take the same proceedings, as is provided in the case of drawing petit jurors, for drawing the names of twenty-three persons from said list of grand jurors, to serve as grand jurors, and the same shall be summoned and served in like manner, and with like pay, as petit jurors. If any of the persons whose names shall be drawn as grand jurors shall not appear, or shall be exempted or excused, the court may order a sufficient number to be drawn and summoned to complete the panel."

And it is provided by How. Stat. § 9490, that—

"Any court in which a grand jury may be sitting may discharge any of the grand jurors for intoxication, or other gross misconduct; and in case of such discharge, or in case of the sickness, death, or non-attendance of any grand juror, after he shall have been sworn, the court may cause another juror to be summoned from among the by-standers or inhabitants of the city, township, or

village, having the qualifications required by law, and to be sworn and serve in his stead."

It is contended by Lauder's counsel that when the court had impaneled and sworn the 20 persons as a grand jury, and they had been charged, and had retired to their room, the power of the court was exhausted, and there was no authority to add another or more jurors, except in the cases pointed out by said section 9490, and the following cases are cited in support of such contention: *Portis v. State*, 23 Miss. 578, 582, 583; *Finley v. State*, 61 Ala. 201; *Berry v. State*, 63 Id. 126; *Couch v. State*, Id. 163; *State v. Symonds*, 36 Me. 128; *State v. Bowman*, 73 Iowa, 110. How. Stat. § 7578, provides that—

"Whenever, for any cause, grand or petit jurors shall not have been drawn and summoned to attend any circuit court, or a sufficient number of qualified jurors shall fail to appear, such court may, in its discretion, order a sufficient number of grand or petit jurors, or both, to be forthwith drawn and summoned to attend such court."

This section and the twenty-third section of the Wayne county jury act, heretofore given, it is argued by relator's counsel, have reference only to proceedings before the jury is impaneled and sworn. Therefore the deduction is made that the addition of Mr. Flowers to the grand jury was not a mere irregularity, but was done by a proceeding wholly illegal and unwarranted.

On the other hand, the counsel for the people call our attention to How. Stat. §§ 9496, 9497, reading as follows:

"Sec. 9496. A person held to answer to any criminal charge may object to the competency of any one summoned to serve as a grand juror on the ground that he is the prosecutor or complainant upon any charge against such person; and, if such objection be established, the person so summoned shall be set aside.

"Sec. 9497. No challenge to the array of grand jurors, or to any person summoned as a grand juror, shall be

allowed in any other case than that specified in the preceding section."

It is evident, as was held in *Thayer v. People*, 2 Doug. 417, that this right of challenge allowed in these sections can only be exercised by a person shown to the court to be under prosecution, and whose case is about to be submitted to them; and therefore Lauder has not been at any time in a condition to challenge the array, or any person summoned as a grand juror. But he certainly has the right to raise, by plea in abatement, or on motion to quash, the same objections to the grand jury that a person under prosecution at the time it was impaneled could have interposed. But, has he the right to raise any other? We think not. The decisions in other states throw no particular light on this question, when we consider these statutes, except in states having similar laws. It was evidently intended by the Legislature that no mere technicalities or irregularities should be permitted to quash the grand-jury panel, and that only in case of a prosecutor or complaining witness being summoned could the accused person successfully complain and exercise the right of challenge. And, certainly, if a person under accusation and arrest, and about to have his case submitted to the grand jury, could interpose but this one objection to the formation of the grand jury, he would not be permitted, after indictment found against him by such grand jury, to have such indictment quashed for any incompetency of a grand juror, or any irregularity in the selection or formation of the jury, which he could not raise before the jury was sworn. Such a holding would be nonsensical, and entail needless expense. And Lauder must stand in the same position. He can have no advantage over one who might have been under accusation and arrest at the time of the impaneling of the jury.

I am satisfied that the Legislature has wisely

ordained that no inquiry for the purpose of quashing an indictment shall be made into the composition of a grand jury, or as to the competency of the individual jurors, except in cases where some member has been the prosecutor of, or the complaining witness against, the person indicted. It must be remembered that the grand jury does not settle the guilt or innocence of the accused, but acts something the same as does an examining magistrate. No irregularities in the examination of an accused person before a magistrate are permitted to quash an information filed in the circuit court against him, and based upon such examination. The admission of incompetent evidence, or the rejection of proper testimony, by the justice of the peace, or other person holding such examination, has no effect upon the information. This proceeding to find an indictment before a grand jury, or to bind an accused person over to the circuit court by a justice of the peace, is but the presentment of a case to be tried before a petit jury, and the proceeding is not to be governed by any mere technicalities, as long as the substantial rights of the accused to a speedy and fair trial before a jury of his peers is preserved and remains to him. In a case where a grand jury was impaneled without any jurisdiction whatever, or fraudulently, or in willful disregard of the law and the rights of the accused, or when substantial injustice was shown to have been done him by any of the proceedings in organizing the grand jury, or by the proceedings before it after it was organized, it would be the duty of the court, upon proper showing, to quash the indictment. *U. S. v. Reed*, 2 Blatchf. 435, 449; *U. S. v. Tallman*, 10 Id. 21; Thomp. & M. Jur. § 518, p. 596. But that is not this case, as far as the organization of the jury is concerned. It is not shown that the addition of Mr. Flowers to the jury was of any disadvantage to Mr. Lauder, or that he was

in any way prejudiced against him. It is manifestly in the discretion of the court, under our statutes, to impanel a grand jury of any number of men not more than 23 or less than 16. If, after the jury had been impaneled and sworn with 20 members, the court had seen fit to add more thereto, and had forbidden the 20 to do any business until the others were drawn and summoned, and, after such others appeared and were accepted, had called the 20 in, and, adding the others, had sworn and charged them over again, there certainly could have been no cause of complaint; or, if a person drawn and summoned before the 20 were sworn, but failing to appear until afterwards, had been, on appearance, sworn and sent to the jury-room to join his fellows, this would not have invalidated the panel, or have been a cause for quashing an indictment found by the grand jury as so constituted.

The rare exercise of the authority conferred upon the circuit courts in this State to order a grand jury has left us comparatively bare of precedents, and with but few interpretations of the statutes relating to the organization of grand juries, and the procedure before them. But it was held in *Findley v. People,* 1 Mich. 234, that where a grand jury had finished their business, and been dismissed without day before the adjournment of the court, they might be resummoned, at any time during the term, to inquire into an offense committed subsequently to their discharge, and grand jurors who were originally summoned, *but did not appear and act with their fellows before they were dismissed, might be resummoned, and on appearing might act with them on their second convocation;* and that a grand juror, who appears after the jury have been sworn and charged, may or may not be sworn in the discretion of the court, when there are enough grand jurors without him. In speaking of the two grand jurors who were drawn and summoned to attend the September

term of the circuit court for the county of Oakland, but who did not attend at the first session of such grand jury, the Court say:

"It is said that they were not sworn at the commencement of the term, and, though grand jurors, that they did not belong to the grand jury inquiring in and for the body of the county of Oakland. If they had not been dismissed for the term, it would have been competent for the court *at any time before the panel had been dismissed*, upon their coming into court, to have sworn them, and sent them to their fellows. It has been very usual to do this when delinquent jurors have come in on the same day after the jury have been sworn and charged. If it may be done that day, it may be done at any time during the session of the grand jury. It is a matter entirely in the discretion of the court; and circumstances, as the absence of a part of those impaneled, from sickness or other cause, might make its exercise very proper." See, also, *Wadlin's Case*, 11 Mass. 142.

So we think that, in its discretion, the court may increase the number of grand jurors, after they are sworn and charged, to any number not more than 23, if the exigencies of justice require it in the opinion of the court. Such discretion could not be used to the disadvantage or persecution of any accused person, as this would manifestly be an abuse of discretion; and if, as suggested by a member of this Court upon the hearing, such addition was made for the purpose of procuring votes enough to find an indictment against any person who could not be indicted without such addition, such indictment would not be permitted to stand. In this case, the addition was made for the purpose of securing a juror who was a stenographer. There was nothing wrong in this, and, as before shown, it was desirable that such a juror should be procured, if possible to do so under the law, and not in violation of it. And it nowhere appears that this addition had any weight or bearing one way or the other upon Lauder's case.

It is said in Thompson & Merriam on Juries, § 507,. that there is no case showing any authentic instance of a challenge allowed to grand jurors, either individually or to the array, at common law; and it is asserted that the right exists in the states of the Union only by force of statute law. Id. § 519.

Michigan is not alone in prohibiting challenges to the grand jury except in certain cases. In New York, Missouri, Kansas, and Oregon challenges to the array or the poll are more or less interdicted. 2 Rev. Stat. N. Y. p. 724, §§ 27, 28; Code, Crim. Proc. N. Y. 1881, § 238; *Carpenter v. People,* 64 N. Y. 483; Rev. Stat. Mo. 1835,. p. 479, § 3; Rev. Stat. Mo. 1845, p. 863, § 3; Rev. Stat.. Mo. 1879, § 1773; *State v. Bleekley,* 18 Mo. 428; *State v.. Welch,* 33 Id. 33; Comp. Laws Kan. 1879, § 4570; Gen.. Laws Or. p. 345, § 35; *State v. Fitzhugh,* 2 Or. 227. But. it is held in most, if not all, of these states that if there has been any improper conduct or fraud on the part of the officers in selecting the jury, or impaneling them, by which the accused person has been prejudiced, the proceedings, which are always under the supervision and control of the courts, may be reached and corrected by plea. in abatement or motion to quash. The courts have general power to preserve the pure and just administration of the law, and their discretion will always be exercised freely for the purpose of securing such end.

The second plea in abatement alleges that while the indictment and the charges of bribery therein contained were pending before the grand jury, and such grand jury were inquiring whether they would find the same to be a. true bill, and after Peter Hirth, Charles G. Eggeman,. Charles Flowers, Augustus G. Kronberg, and William Uthes, who are all the witnesses for the people whose names are indorsed upon said indictment, had been fully examined and given their testimony before

the said grand jury, and upon September 18, 1889, a subpœna was issued to said Lauder, and he was brought before the said grand jury as a witness; that he was wholly ignorant of the fact that said indictment was pending against him, or charges of bribery; that he was compelled under the legal restraint of said subpœna to take his oath, as a witness, before said grand jury, and under such oath he was required and compelled to give his testimony in the matter of the charges of bribery set forth in said indictment, and so pending against him before said grand jury; that he was interrogated fully as to said charges of bribery, and was questioned as to each and every detail and circumstance of the same, and to all of which interrogatories and questions he was required to answer, without having the aid and advice of counsel; that he did answer such questions, and, because he did not have the aid and advice of counsel to bring out all the facts and circumstances of the case, he did, in response to such questions, testify to facts material and necessary to prove the truth of the charges of bribery against himself, and to sustain and establish the indictment as a true bill; and that upon his testimony, and that of the said witnesses named upon the indictment, the same was found, on September 24, 1889, to be a true bill. To this plea the people demurred, thereby admitting the facts to be as stated in said plea.

The plea amounts substantially to this: An indictment was pending before the grand jury against Lauder. He had no knowledge of it, or that there were any charges of bribery against him being investigated by such grand jury. After all the witnesses, examined in relation to the charge against him, had testified fully, a subpœna was served upon Lauder to appear and testify before the grand jury. He obeyed the subpœna, and made no objection to giving his testimony. He gave testimony tending to

support the charges against him, and to sustain the indictment pending against him before the grand jury. His testimony cannot be said to have been voluntary. He was compelled to attend and to testify by the mandate of the subpœna. He might have objected, but, if he had, although under the circumstances he could not lawfully have been compelled to testify, yet he might have been fined or imprisoned for his disobedience of the subpœna before his rights could have been asserted and settled. This is not the case of a person voluntarily appearing and offering himself as a witness. In such case, if he did not object to any question put to him, his testimony would be voluntary, and could be used against him. *People v. Arnold*, 43 Mich. 303; *People v. Eaton*, 59 Id. 559, 562. And if he had known that he himself was under investigation, and that his testimony was to be used against him to uphold an indictment then pending before the grand jury, and had not objected, there might be some sense in the claim that he had waived his right to claim his privilege; but brought before the grand jury by a subpœna that promised him punishment if he did not obey, and not knowing that he was under accusation, or that the intent was to indict him out of his own mouth, there is no respectable authority to be found anywhere, nor does it stand in right or reason, that this testimony is to be considered voluntary, or that it is to be inferred that he has waived his constitutional right to be protected against criminating himself.

The Federal Constitution, by the addition of the first amendments ever proposed and adopted, contains a bill of rights, and article 5 of such bill of rights provides that no person "shall be compelled, in any criminal case, to be a witness against himself." Our own Constitution expressly declares that—

"No person shall be compelled, in any criminal case,

to be a witness against himself, nor be deprived of life, liberty, or property without due process of law." Article 6, § 32.

This right guaranteed by both Constitutions is a cardinal one, and is guarded and protected by the State organic law in the same sentence with the fundamental right to life, liberty, and property. It has ever been regarded as one of the superior and inalienable rights of the freeman under our system of government, with which neither legislatures nor courts have been permitted to tamper, nor allowed to disturb or destroy. If this indictment stood alone upon the testimony of Lauder, given under such circumstances against himself, all the authorities are united in holding that it could not be sustained. The testimony was incompetent, and an indictment cannot stand upon incompetent evidence alone. Thomp. & M. Jur. § 642; 1 Chit. Crim. Law, 319; 2 Hawk. P. C. chap. 25, § 145, in notes; *State v. Logan*, 1 Nev. 509; *Sparrenberger v. State*, 53 Ala. 481, 486; *Com. v. Knapp*, 9 Pick. 496, 498; 1 Whart. Crim. Law (7th ed.), § 493. Thompson & Merriam on Juries (section 643) sum up the rule as follows:

"If the defendant voluntarily appears before the grand jury, and there gives evidence when his case is under examination, this constitutes no ground for setting aside an indictment subsequently found against him; *aliter*, of course, where the defendant is compelled to appear and give evidence in the proceedings against himself. But at this point a distinction must be taken. Suppose the grand jury, by virtue of their inquisitorial powers, are engaged in searching out crime. Clearly, they may summon any person whom they have good reason to believe to be cognizant of facts which will lead to the detection of crime. In the end they may see fit to find indictments against some of the persons whom they have compelled to appear before them as witnesses. If any of these indicted persons has seen fit to give answers implicating himself, the validity of the indictment found upon this

testimony cannot be impeached by the circumstance that he has been compelled to appear before the grand jury. Otherwise, the inquisitorial powers possessed by this body in many states would be greatly impaired. In many cases the inquiry would be stopped at the very threshold."

As before said, Lauder did not voluntarily appear before the grand jury. He was brought in by the process of subpœna, which he could not disobey without peril. Nor was he made acquainted with the fact that he was under suspicion, and that an indictment was drawn and pending against him, and that his testimony would be used against him for the purpose of finding the indictment a true bill. The bringing of Lauder in before the grand jury under such circumstances, and subjecting him to an examination by the prosecutor, without counsel to aid him, and in ignorance of the object of his examination, is characterized by his counsel as an unwarranted and inexcusable legal outrage. If Lauder had known the purpose of his examination, he would have undoubtedly asserted his right to refuse to testify, and he would have been sustained in such refusal by this Court, as in a like case we have unanimously sustained the Detroit Street Railway Company in refusing to submit their private books and papers to the inspection of the grand jury under a showing that the avowed object of such inspection was to obtain evidence upon which to indict the officers of such corporation. The subpœnaing and examination of Lauder, under the circumstances alleged in the plea (which must here be taken as true), was unwarranted, and an outrage. Prosecuting officers ought not to forget, in the zeal of a commendable investigation of a supposed great public scandal and corruption, that accused persons are presumed to be innocent until proven guilty, and that there are no circumstances possible in a republican government that can take away

from any citizen, in time of peace, the inalienable rights guaranteed to him by the fundamental law of both the State and Nation, and among which, no less than any other, is the right not to be compelled to be a witness against himself in any criminal case.

And it must be remembered that a grand jury is not above the law, or the Federal and State Constitutions. The law that creates it governs it, and the Constitution prevails, and must be obeyed, and cannot be either violated or evaded on the ground of any supposed public necessity. The grand jury has always been considered in the law as a means of protection, and not as an oppression, to the citizen. It was never intended to be used as an engine of personal or partisan malice, and cannot lawfully be so used; neither can it, although inquisatorial in its procedure, deprive the citizen of any substantial right in which he is protected by the express mandate of the organic or statute law. The grand jury, in the language of the text from Thompson & Merriam, "may summon any person whom they have good reason to believe to be cognizant of facts which will lead to the detection of crime," and they may find indictments against persons whom they have compelled to appear and testify before them. But the grand jury cannot, under any authority found in the books, or existing in reason, if this constitutional right is to be preserved, call a person before them and compel him to testify against himself for the express purpose of finding an indictment, then pending before them, a true bill against him. This is what was done in this case. If the prosecutor had said to Mr. Lauder, "The jury is considering an indictment against you for the crime of bribery, and your answers will be used against you; you are at liberty to answer questions or not, as you choose,"—the case would have

been different. This is what should have been done. Lauder's testimony would then have been voluntary.

It is argued that Lauder is a shrewd, bright man, and ought to have known his privilege, and to have taken advantage of it by refusing to testify; that his testimony must be presumed to have been voluntary, because he knew his right and did not insist upon it. But, in dealing with the principle here involved, we are to establish a precedent in this State for all time to come, which shall govern and operate against all men alike, the ignorant as well as the learned. Courts cannot inquire in any or each particular case what the intelligence of the accused is, or presume that, because of a superior grade of intelligence, one man knows his right when another does not. There is no necessity anywhere, and never can be under any circumstances, that the law should be stretched to make an accused person testify against himself in a criminal case; and, when force and deception are combined to attain such an end, the courts must see to it that his rights are restored, notwithstanding popular clamor or supposed necessity is invoked to justify his deprivation of constitutional privileges. We are not dealing alone with Lauder's case, but with the rights of every citizen of our great State for all time to come. In such a case, no constitutional barrier can be let down as against encroachments upon the liberty of the citizen.

But it is argued that there was other evidence than that of Lauder himself upon which the indictment was in part based; that the evidence of the other witnesses must be presumed to have been competent; and that the general rule is that where the grand jury indict upon evidence, some of which is competent and some incompetent, the court will not go behind the indictment, or weigh the sufficiency of the evidence. See *U. S. v. Reed,* 2 Blatchf.

466; *State v. Logan,* 1 Nev. 515, 517; *People v. Hulbut,* 4 Denio, 133; *U. S. v. Shepard,* 1 Abb. (U. S.) 431; *Washington v. State,* 63 Ala. 189; *Sparrenberger v. State,* 53 Id. 481; *Bloomer v. State,* 3 Sneed, 69; *Hope v. People,* 83 N. Y. 418; *State v. Dayton,* 23 N. J. Law, 52, 57. It is also urged that the plea fails to show (as it does) that all the facts and circumstances material and necessary to sustain the indictment came solely from Lauder; nor does it appear, except by inference, what part the testimony of Lauder played in the finding of the true bill. It is suggested with much force by his counsel that, if there was testimony sufficient to indict him without his evidence, why was he subpœnaed and sworn unless it was to complete the chain against him, by the furnishing of a missing link out of his own testimony. The case is then left in this uncertainty: Was he indicted solely upon the testimony of the others without reference to his own evidence, or was he indicted solely on the strength of his own testimony, or was he indicted upon the whole testimony?

It is undoubtedly the general rule that where an indictment is founded upon both competent and incompetent testimony it will be permitted to stand, as the courts will not undertake to weigh the sufficiency of the competent evidence when it is shown that there was any. But what then is the remedy when the rights of the accused have been violated as in this case? Chief Justice Green, in *State v. Dayton, supra,* while holding that an indictment might be sustained though found on incompetent and competent testimony combined, said:

"It is not denied that the court may, in the exercise of a sound discretion, in order to promote the purity of the administration of justice, and for the greater security of the rights of the citizen, quash an indictment by reason of the misconduct of the grand jury."

82 Mich.—10.

But he held that this discretion could not be exercised upon a plea in abatement.

I can find no case in the books where a person charged with crime before a grand jury, and pending investigation of such charge before them, has been brought in by subpœna and compelled to testify against himself, without warning of the charge against him, and without knowledge of it, in which an indictment found against him after the taking of such testimony has been sustained, while there are many to the contrary. If the indictment is not quashed, the accused person has no remedy, and is put upon trial through a violation and open disregard of one of his most valued rights. On principle, I do not see how such an indictment can stand. It is founded necessarily upon the violation of a constitutional right, which the law never permits in any case. Besides, the prosecutor, although the testimony so given before the grand jury cannot be used against Lauder upon his trial, has in his possession facts and circumstances divulged by Lauder, which he can use and avail himself of upon the trial. He obtained this testimony unlawfully, and has no right to so use it, but it is within his knowledge, and there is no means known to the law to prevent him from taking advantage of such knowledge.

If a failure of justice shall occur in this particular case, it will be the fault of those who have invaded and overridden the constitutional rights of the accused, and not of the courts, whose duty it is to expound the law without fear or favor, and to stand as a stone wall in front of the Constitution in the defense of the inalienable rights of all men as declared in the bill of rights in that instrument. The supposed or even probable failure of justice in Lauder's case cannot be entertained by this Court as a reason for establishing a precedent that will, for all the years of the future (unless overruled in some

other case by this Court), authorize the compelling of a witness to testify against himself before a grand jury for the express purpose of indicting him; for the only redress in this case, and any other, to the accused person, and the only way to prevent a repetition of this practice in other cases, is to quash the indictments when such a course is taken. Courts cannot make law for particular cases, but must expound it the same, and as it is, in all like cases.

And it will not do to say that this defect in the indictment cannot be raised by plea, but must be brought before the court upon motion to quash. Such holding only postpones the evil day, and makes additional expense, as a motion to quash would at once follow such a ruling.

I have carefully read the opinion of the learned judge below, who refused to quash the indictments against Lauder, and have examined the cases cited by him in support of his ruling. Such examination but confirms me in the views above stated.

In the case of *In re Hackley*, 24 N. Y. 74, it was held that the constitution did not protect a witness in a criminal prosecution *against another* from being compelled to give testimony which implicates him in a crime *when he has been protected by statute against the use of such testimony on his own trial.* Hackley was summoned before a grand jury, and sworn as a witness in a complaint pending before such grand jury against certain aldermen of the city of New York for feloniously receiving a gift of money under an agreement that their votes should be influenced thereby. He was asked,—

"What did you do with the pile of bills received from Thomas Hope, and which he told you amounted to $50,000?"

He refused to answer, for the following reason:

"Any answer which I could give to that question would disgrace me, and would have a tendency to accuse me of a crime."

The matter went to the court of appeals. It was decided against Hackley, upon the express ground that the testimony, by an express statute, could not be used against him, and therefore he was not required to give evidence *against himself upon his own trial,* which was forbidden by the constitution. The bribery act (so-called) of 1853 in New York declares that the giving to or receiving money, etc., by any of the divers public officers named, including any member of the common council of a city, with a view to influence their action upon any matter which may come officially before them, shall be an offense punishable by fine or imprisonment in a state prison. For the purpose of enabling the public to avail itself of the testimony of a participator in the offense, the fourteenth section provides as follows:

"Every person offending against either of the preceding sections of this article shall be a competent witness against any other person so offending, and may be *compelled* to appear and give evidence before any magistrate or grand jury, or in any court, in the same manner as other persons; *but the testimony so given shall not be used in any prosecution or proceeding, civil or criminal, against the person so testifying.*"

In the same statute by which Hackley was compelled to testify against his participator in the crime, and thereby also against himself, he was as amply protected against the use or employment of such testimony against himself in any trial or proceeding as the constitution protected him. Would *it be for a moment contended that,* under this statute, the testimony thus given by Hackley could be used as the basis of an indictment against him by this same grand jury? And Justice Denio, in the opinion in the Hackley case, expressly says, at page 82:

"It is perfectly well settled that where there is no legal provision to protect the witness against the reading of the testimony on his own trial he cannot be compelled to answer. This course of adjudication does not result from any judicial construction of the constitution, but is a branch of the common-law doctrine which excuses a person from giving testimony which will tend to disgrace him, to charge him with a penalty or forfeiture, or to convict him of a crime. It is of course competent for the legislature to change any doctrine of the common law, but I think they could not compel a witness to testify on the trial of another person to facts which would prove himself guilty of a crime, *without indemnifying him against the consequences,* because I think, as has been mentioned, that by a legal construction the constitution would be found to forbid it."

In *People v. Sharp,* 107 N. Y. 427, the ruling *In re Hackley* was sustained, and it was held that Sharp could have been compelled to testify before a legislative committee under a statute which authorized it, as it did not violate the constitutional provision that no person shall "be compelled, in any criminal case, to be a witness against himself," as it was provided in the same statute, not only that "the testimony so given shall not be used in any prosecution or proceeding   *   *   *   against the person so testifying," but that the person testifying to the giving of a bribe, which has been accepted, "shall not thereafter be liable to indictment, prosecution, or punishment for that bribery." Here, again, the same statute that compelled Sharp to testify before the legislative committee as to the giving of a bribe protected him, by the same ample shield as the constitution itself, by providing that such testimony could not be used against him, and further, if the bribe which he testified to offering was accepted, it exempted him from all penalty or punishment for such bribe-giving. This case cannot certainly be relied upon to authorize the compelling of Lauder to testify against himself before the grand jury,

when an indictment for bribery against him was under consideration by them, but is authority directly to the contrary. This case also holds that Sharp, attending before said legislative committee in obedience to its subpœna, and being sworn and examined as a witness, could not be deemed a willing or consenting witness because he made no objection to giving his testimony.

In *State v. Froiseth,* 16 Minn. 297, the defendant was indicted for receiving greater fees than were allowed by law for his services as justice of the peace. He was required by the grand jury to testify as a witness touching the charge alleged against him in the indictment. The court said:

"We think there can be no doubt upon the question. The bill of rights expressly declares that 'no person * * * shall be compelled, in any criminal case, to be a witness against himself.'" See, also, *U. S. v. Brown,* 1 Sawy. 534, 537; *U. S. v. Farrington,* 5 Fed. Rep. 348; *U. S. v. Kilpatrick,* 16 Id. 765.

In *People v. Singer,* 5 N. Y. Crim. Rep. 1, 18 Abb. N. C. 96, the defendant was indicted for murder in the second degree. While she was in custody, pending a preliminary examination before a magistrate, she was taken before the grand jury. The district attorney refused to examine her, and informed her that if she answered any questions it might hurt her, and she ought not to, and was not obliged to, answer, as her answers might criminate her. Notwithstanding this advice, she was asked questions by some of the jurors, and answered them. The court said:

"I am satisfied, upon a careful consideration of all the circumstances, that the prisoner was compelled by the grand jury to give evidence against herself before that body, when it was investigating a charge of crime against her, and that the indictment should be quashed on that ground. No precedent has been cited, nor am I aware

of any, for the action of the grand jury in thus subjecting an accused prisoner to interrogation. The practice is too dangerous to be sanctioned without express legislative authority."

In *People v. Haines,* 1 N. Y. Supp. 55, the defendant was summoned before the grand jury, and after being sworn proceeded to answer questions against himself put by the grand jury. The court set aside the indictment, and said:

"The situation of a person charged with crime which is under investigation before the grand jury is similar to that he would occupy if under investigation before a committing magistrate, and he should be treated in all respects as he would be if the crime charged against him was being investigated before the committing magistrate instead of the grand jury. It was so held in reference to a coroner's inquest, in *People v. Mondon,* 103 N. Y. 211, and I see no reason why it should not be so held in reference to the grand jury. In fact, the preliminary examination which takes place before the committing magistrate, the coroner's inquest, and the grand jury, is in the main for the same purpose; and a person who is charged with the commission of a crime which is under investigation before either of them should be treated in all respects as required by sections 188, 189, and 198 of the Code of Criminal Procedure. He should be informed of the charge against him, and of his right to the aid of counsel; and, if he has no counsel, must have reasonable time to send and obtain one. He must be advised of his right to make a statement in relation to the charge against him, or that he may waive making one, and that his waiver cannot be used against him on his trial."

In *People v. Briggs,* 60 How. Pr. 17, the indictment was quashed because the wife of the respondent was called and sworn before the grand jury. The court said, quoting Justice Story in *U. S. v. Coolidge,* 2 Gall. 364:

"The grand jury is the great inquest between the government and the citizen. It is of the highest importance that this institution be preserved in its purity, and that

no citizen be tried until he has been regularly accused by the proper tribunal."

See, also, as bearing upon this question, the following cases: *U. S. v. Coolidge, supra; People v. Sellick,* 4 N. Y. Crim. Rep. 329; *U. S. v. Kilpatrick,* 16 Fed. Rep. 765; *In re Falvey,* 7 Wis. 630.

I am satisfied that the writ of *mandamus* should be granted, directing the Wayne circuit court to quash the indictments against Lauder. It was urged on the argument that it appears from his own testimony that Lauder has been guilty of corruption in public office, and that the granting of this writ will let the guilty go free. But it must be remembered that this testimony, which tends to show his guilt, was obtained from him in violation of his constitutional rights. Such testimony could not be used against him upon his trial, under all the authorities. The preservation of the constitutional privileges, affecting the liberty of the citizen, is of paramount importance, beside which each individual case sinks into insignificance. The right which, by the granting of this writ, we preserve to Lauder is also the property of every other citizen of our State. If we take it away from Lauder because we believe him guilty of the offense charged against him, we must take it away from all others, or be guilty ourselves of an inconsistency which would be a disgrace to us, and a reproach to the law.

I cannot better conclude than by quoting the language of Justice Peckham, in granting a new trial to Jacob Sharp, who had testified that he was guilty of bribery before the legislative committee of New York:

" The law must protect all who come within its sphere, whether the person who invokes its protection seems to be sorely pressed by the weight of the inculpatory evidence in the case or not. It cannot alter, for the purpose of securing the conviction of one who may be called or regarded as a great criminal, and yet be invoked for the

purpose of sheltering an innocent man. In the eye of the law, all are innocent until convicted in accordance with the forms of law, and by a close adherence to its rules." *People v. Sharp*, 107 N. Y. 476, 477.

LONG, J., concurred with MORSE, J.